CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
*for Harrisonburg*
JAN 1 6 2008
JOHN F. CORCORAN, CLERK
BY: *Bright*
DEPUTY CLERK



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

JOHN R. MILLER,                              )
                                             )
    Plaintiff,                       )   Civil Action No. 5:05CV00064
                                             )
v.                                           )   **MEMORANDUM OPINION**
                                             )
PILGRIM'S PRIDE CORPORATION,                 )   By: Hon. Glen E. Conrad
                                             )   United States District Judge
    Defendant.                       )

This matter is before the court on the plaintiff's motion for a new trial and the defendant's renewed motion for judgment as a matter of law. For the reasons set forth below, both motions will be denied.

## I.   **BACKGROUND**

Following a trial in this matter on the plaintiff's claims under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. ("FMLA") and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA"), the jury was left to consider three of the original six claims asserted by the plaintiff, John R. Miller ("Miller"): (1) a claim of interference with the plaintiff's rights under the FMLA, (2) a claim for retaliatory discharge under the FMLA, and (3) a claim that Miller was discharged because of his disability in violation of the ADA. The jury first found in favor of the defendant, Pilgrim's Pride Corporation ("Pilgrim's Pride"), on the FMLA interference claim. The jury then went on to find in favor of Miller on the ADA claim and the FMLA retaliation claim, however it also determined that Pilgrim's Pride had demonstrated that it would have terminated Miller regardless of his disability or the exercise of his rights under the FMLA.

On August 31, 2007, the court entered a Final Judgment and Order based upon the jury's verdict and awarded Miller a portion of his reasonable attorney's fees. Pilgrim's Pride then filed a renewed motion for judgment as a matter of law with regard to Miller's claim for discriminatory discharge under the ADA. Miller, on the other hand, filed a motion for new trial solely with regard to the "same decision" determination made by the jury on both the ADA claim and the FMLA retaliation claim. After a hearing on these motions took place on October 31, 2007, the court ordered Pilgrim's Pride to file certain additional records with the court pertaining to the preventive maintenance work performed at its Broadway facility during and after Miller's tenure as maintenance manager. The court, as well as the parties, have had the opportunity to review those records. Therefore, both motions are now ripe for decision.

## II.   <u>PLAINTIFF'S MOTION FOR A NEW TRIAL</u>

Miller states that he seeks a new trial in the position of a prevailing party based upon this court's Final Judgment and Order entered on August 31, 2007. Miller requests a new trial only as to the "same decision" issues regarding which the jury answered the following questions on the special verdict forms in the affirmative:

> 2. Do you find that the defendant has proven by a preponderance of the evidence that it would have made the same decision to terminate the plaintiff, even if it had not considered plaintiff's disability?

> 2(a). Do you find that the defendant has proven by a preponderance of the evidence that it would have made the same decision to discharge the plaintiff, even if it had not considered the plaintiff's exercise of FMLA rights?

Miller bases his motion upon the following arguments: (1) Pilgrim's Pride failed to provide preventive maintenance records to Miller although those records were available and would have refuted Pilgrim's Pride's stated reasons for his discharge; (2) the court improperly refused to give

2

Miller's requested jury instruction on an adverse inference with regard to the testimony of Brandy Barb; (3) the court improperly refused to permit certain testimony with regard to Barb's discriminatory animus toward those employees on FMLA leave; and (4) the court improperly admitted into evidence a letter from Dr. Lawrence Conell to a rehabilitation counselor. These arguments will be addressed in turn.

## A.    Standard of Review

A court may grant a new trial "on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; . . . ." Fed. R. Civ. P. 59(a). A district court may set aside the jury's verdict and grant a new trial if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice." Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996) (internal citations omitted). This is true "even though there may be substantial evidence which would prevent the direction of a verdict." Id. Factual inquiries are the key to examining whether the verdict is against the clear weight of the evidence or is based upon false evidence. Id. In making its determination, a court may give consideration to the credibility of witnesses. Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). Ultimately, "[t]he decision to grant or deny a new trial is within the sound discretion of the district court." Id. Nevertheless, Federal Rule of Civil Procedure 61 states that:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.

3

In fact, "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Fed. R. Civ. P. 61.

The plaintiff also claims that he is entitled to a new trial under Federal Rule of Civil Procedure 60(b)(3) which permits the court to order a new trial in case of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." Fed. R. Civ. P. 60(b)(3). A district court may grant a new trial under Rule 60(b)(3) if (1) the moving party has a meritorious defense; (2) the moving party proves misconduct by clear and convincing evidence; and (3) the misconduct prevented the moving party from fully presenting its case. Schultz v. Butcher, 24 F.3d 626, 630 (4th Cir. 1994). Under this rule, there is no requirement that the moving party demonstrate that the results would have been different absent the misconduct. 24 F.3d at 631. Nevertheless, "the court must balance the competing policies favoring the finality of judgments and justice being done in view of all the facts, to determine within its discretion, whether relief is appropriate in each case." Id. at 630 (citing Square Constr. Co. v. Washington Metro. Area Transit Auth., 657 F.2d 68, 71 (4th Cir. 1981)).

**B.       Preventive Maintenance Records**

Miller claims that he is entitled to a new trial because Pilgrim's Pride failed to produce certain preventive maintenance records in response to his discovery requests which would have, according to the plaintiff, foreclosed Pilgrim's Pride's arguments with regard to its non-discriminatory reasons for his termination. During the course of various discovery disputes between the parties, Magistrate Judge B. Waugh Crigler entered an order on December 15, 2006 which stated, in pertinent part, as follows:

4

On or before January 10, 2007, each party is to certificate to the other that a reasonable and diligent search of their records has been conducted, and, as a result, the party either is supplementing prior disclosures or the party has produced *all equipment performance and service records within that party's control which is responsive to the other party's request for production of documents.* The counsel shall meet, confer, compare and coordinate equipment performance and service records secured from third party vendors or suppliers.

(Emphasis added). Miller's requests for production of documents included such categories as documents (1) relating to the plaintiff, (2) relating to the reasons his employment was terminated, (3) relating to his employment with Pilgrim's Pride, (4) relating or referring to any conduct by Miller which Pilgrim's Pride contended supports the reasons for his termination, (5) relating to downtime for production lines, and (6) service records from equipment dealers and/or service technicians.

With regard to the reasons for Miller's termination, Pilgrim's Pride had stated that his performance was deficient because he

failed to substantively reduce mechanical downtime; failed to reduce maintenance overtime; failed to ensure that work orders were completed in a timely fashion; and failed to address critical maintenance issues, including increasing water reuse capacity and increasing paw harvesting.

See Pilgrim's Pride Corporation's Answers to Interrogatories #4. Ted Lankford, the plant manager at the Broadway facility, stated in his affidavit dated April 20, 2007 that "[w]hen I arrived at the Broadway facility in February 2004, it appeared to me that necessary maintenance regimes, including an effective maintenance program, were not effectively in place. The state of the plant indicated to me that the Maintenance Department lacked effective leadership." This affidavit was used to support Pilgrim's Pride's motion for summary judgment. At the hearing on the defendant's motion for summary judgment, counsel for Pilgrim's Pride argued that

5

[w]hat Mr. Lankford saw when he arrived in mid February was significant mechanical down time one day because it appeared to him that a preventive maintenance schedule was not in place. . . . there was not a structure in place. There was not a protocol in place. Preventive maintenance is routine. There should be no issue about that. That's what Mr. Lankford is observing. Nothing to do with Mr. Miller's – the reason for his absence, but the fact that the facility, maintenance department is not functioning. Your Honor, that's ultimately what leads to his termination.

Miller contends that, based upon Pilgrim's Pride's answers to interrogatories, Lankford's affidavits, and the argument of the defendant's counsel before this court, Pilgrim's Pride was relying upon the alleged lack of preventive maintenance performed during Miller's tenure as a reason for his termination. In response to the order of the magistrate judge, Pilgrim's Pride did produce some documents along with the affidavit of Robert Bahr in which he stated that he was not aware of any other responsive documents. Nevertheless, Miller did not receive any records or reports with regard to preventive maintenance.

At trial, Pat Corbin, a clerk in the maintenance department at Pilgrim's Pride during the relevant time period, was called as a witness by Miller. During her testimony, Ms. Corbin stated that she created and printed out preventive maintenance forms from a SAP computer system to give to the supervisors. Ms. Corbin testified that she would then receive the forms back after work had been completed and would enter the time taken for that work into the system. According to Ms. Corbin, any comments with regard to the specifics of the work performed would be on the hard copy of the forms themselves, which were later destroyed.

Miller testified at trial that he did perform the necessary preventive maintenance work while employed at Pilgrim's Pride, that a preventive maintenance program was in place, and that machine downtime was due to a large number of sick birds going through the production process. Therefore, Miller claims that the preventive maintenance records that were maintained by

6

Pilgrim's Pride as described by Ms. Corbin and never produced in this case would have demonstrated that his testimony was true and that Lankford's comments with regard to his poor performance were false. As such, Miller contends that those records would have foreclosed Pilgrim's Pride's arguments with regard to non-discriminatory reasons for his termination.

Therefore, Miller now asserts that Pilgrim's Pride failure to provide the preventive maintenance records that were maintained on the SAP system and the allegedly false testimony of Ted Lankford and Robert Bahr should be sufficient to justify a new trial under Federal Rule of Civil Procedure 59. Miller also contends that Pilgrim's Pride has committed misconduct by failing to disclose the records and that this misconduct also justifies a new trial under Federal Rule of Civil Procedure 60(b)(3).

In certain cases, misconduct during discovery may be sufficient to justify granting a motion for new trial. For example, in Schultz v. Butcher, 24 F.3d 626 (4th Cir. 1994), the Court remanded the case to the district court for a new trial after finding that the plaintiff had withheld certain information during discovery. In Schultz, the plaintiff had been injured when she was a passenger in a small boat that crossed the wake of a larger ship. 24 F.3d at 628. The plaintiff then filed suit against the company that operated the larger ship, Spirit Cruises, Inc., as well as the operators of the small boat in which she was riding. Id. During discovery, counsel for Spirit Cruises requested copies of any reports concerning the incident. Id. at 629. The plaintiff possessed a United States Coast Guard report stating that the larger ship was not operating at an excessive speed but that the operators of the small boat had crossed its wake at an excessive speed. Id. Nevertheless, she failed to produce this report to Spirit Cruises. Id. At trial, the Court found that the larger ship was negligent in that it had been traveling at an excessive speed,

7

but that the operators of the smaller boat had followed appropriate procedures and were not responsible for the plaintiff's injuries. Id. Spirit Cruises later filed a Rule 60(b) motion for a new trial alleging that the plaintiff had failed to provide the Coast Guard report. Id. at 630. After noting that Spirit Cruises had presented a meritorious defense, the Court then found "that an adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)." The Court then held that, although the finality of judgments is important, "the fairness and integrity of the fact finding process is of greater concern and a party's failure to produce a requested document so favorable to an adversary impedes that process and requires redress in the form of a new trial." Id. at 630-31.

Likewise, in Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272 (Fed. Cir. 2000), a patent case, the Court awarded the defendant a new trial as a sanction for misconduct during discovery. In that case, the plaintiff had failed to provide the name of a witness and to disclose the existence of a deposition which would have been harmful to its position. 212 F.3d at 1288. The Court ultimately concluded that the deliberate suppression of this evidence, which would have played a central role at trial, amounted to bad faith conduct on the part of counsel for the plaintiff. Id. at 1289. Therefore, the Court held, where "counsel deliberately and repeatedly flouts discovery requests and disregards the Federal Rules of Civil Procedure, the sanction of a new trial fits the transgression." Id.

Pilgrim's Pride responds that it did not understand Miller's discovery requests to have encompassed the preventive maintenance records available from the SAP system. Pilgrim's Pride states that it "never contended that Mr. Miller lost his job because no preventive

8

maintenance was done." Instead, he was terminated because he "failed to effectively manage maintenance which led to, *inter alia*, unacceptable levels of downtime." Therefore, according to Pilgrim's Pride, the preventive maintenance records referred to by Miller now would not have been responsive to any of his discovery requests relating to the reasons he was terminated. Pilgrim's Pride also asserts that these records would not have been responsive to requests for documents relating to the plaintiff because Miller did not personally perform preventive maintenance or to requests for documents relating to downtime because these records would not have addressed or identified downtime. Finally, Pilgrim's Pride claims that it understood the order of the magistrate judge, supra, to refer only to service records from outside dealers and service technicians, not to internal service records.

The court finds that, contrary to Pilgrim's Pride's assertions, Miller's broad discovery requests covering documents relating to the reasons given by the defendant for his termination would have included preventive maintenance records because Pilgrim's Pride, at least at an earlier stage of the litigation, did refer to the lack of a preventive maintenance program as one of the reasons justifying its termination of Miller. Nevertheless, the court finds that the defendant's failure to provide these records does not justify the extreme sanction of a new trial.

In order to properly evaluate the possible effect of the preventive maintenance records available from the SAP system, the court entered an order requiring Pilgrim's Pride to file a copy of those records with the court. The court has now reviewed those records, and the parties have had the opportunity to file supplemental briefs with regard to the production of the documents. Pilgrim's Pride has provided several discs which represent archived data for both the Broadway plant and other company facilities for the time period covering Miller's employment with the

9

defendant as well as a period of one year following his termination in August 2004.[1]

As Pilgrim's Pride previously stated, the data includes the date the preventive maintenance form was printed, the date the preventive maintenance form was reentered in the computer, the machine worked on, the time spent on the machine, the parts used, and parts and labor costs. There is no data with regard to any supervisor comments. Although Miller asserts that such a field did exist in the SAP system, Ms. Corbin testified that, if there were comments about various machines, she did not enter those comments into the system.

After reviewing the records, the court finds that they do not contain any information inconsistent with the position taken by Pilgrim's Pride at trial. Although Miller is correct that, early in this litigation, Pilgrim's Pride seemed to indicate that its decision to terminate him was based, at least in part, upon an alleged lack of preventive maintenance, Pilgrim's Pride did not take that position at trial. Instead, the defendant apparently shifted its strategy and pointed to Miller's overall ineffectiveness as the maintenance manager at the Broadway plant, arguing that this lack of effectiveness led to excessive downtime at the facility. Counsel for Pilgrim's Pride did discuss preventive maintenance during opening argument, explaining that mechanical downtime may occur if preventive maintenance is not properly performed on a machine. Again, however, the argument of the defendant's attorney focused upon the effective performance of preventive maintenance and did not argue that no such program was in place.

---

[1] The plaintiff contends that the data was provided by the defendant in a format that is difficult to manipulate and that it comprises a data dump intended to further obstruct the plaintiff's efforts to demonstrate the relevance of the preventive maintenance data. The court agrees that the data, as provided, is somewhat difficult to manipulate and organize. However, the court also finds that the format of the data provided is not inconsistent with the explanation of the defendant that the data was pulled from archives where it had been stored after being purged from the system. According to the defendant, only current data for a one year period is actually maintained on the SAP system, not data such as that requested by the court for a period ending over two years ago.

Miller testified at trial that he had ensured that maintenance work was being performed. Pilgrim's Pride presented no evidence at trial to state that maintenance work had not been performed. Although discovery misconduct may be grounds for a new trial, as in <u>Schultz</u> and <u>Advanced Display</u>, <u>supra</u>, those cases involved situations where a party intentionally withheld evidence that was relevant and impaired the adverse party's ability to present its case. In this case, although Pilgrim's Pride may have made an error in judgment by failing to produce the relevant preventive maintenance records, there is no evidence to suggest that Pilgrim's Pride intentionally withheld this evidence from the plaintiff. Furthermore, the records appear to be cumulative evidence in that Miller himself testified to the preventive maintenance program in place during his tenure as maintenance manager. Based upon the court's review of the records, there is nothing to suggest that this evidence would have been case dispositive, that the evidence presented by Pilgrim's Pride at trial was false, or that the substantial rights of the parties were affected.

Furthermore, Miller himself has submitted a declaration attached to his Response to Production by Defendant Pilgrim's Pride to the Court which makes it clear that the plaintiff was already aware of the information contained within the SAP system as it relates to preventive maintenance. That declaration states as follows:

> 5.     I am familiar with the capabilities of the maintenance software programs used by Pilgrim's Pride during my tenure at the company. From the testimony of Pat Corbin at trial, those programs remain in use at Pilgrim's Pride.
>
> . . .
>
> 7.     Pilgrim's Pride had tutorial packages relating to the software programs it utilized at the Broadway plant. Included in those packages was a demonstration disc. That demonstration disc displayed how easy it is to in-put data and to tailor reports to fit

11

almost any need of a manager. This allowed the inclusion or exclusion of multiple fields of data.

8.     The software programs were very powerful management tools for the maintenance department because of the ability they gave me to look at specific machinery and to pinpoint maintenance history. Thus, there was no problem for me to access any information specific to the Broadway plant with respect to maintenance performed by my department.

Based on Miller's declaration, it appears that he was quite familiar with the SAP program described by Ms. Corbin at trial, that he had used the program while employed at Pilgrim's Pride, and that he was aware that it contained data in various fields related to preventive maintenance performed at the Broadway plant. Miller specifically asked for other types of records during discovery and could have done so for these preventive maintenance records, particularly after he became aware they would not be provided when Robert Bahr filed his affidavit stating that discovery was complete with regard to equipment performance and service records.

In Tunnell v. Ford Motor Co., 245 Fed Appx. 283, 288 (4th Cir. 2007), the Court affirmed the district court's denial of Tunnell's motion for a new trial on the basis of Ford's failure to provide certain records during discovery because Tunnell had already learned about the information contained in those records from other sources. The Court found that this independent knowledge enabled Tunnell to "pursue any further development of the evidence he desired," and therefore, he was not prevented from fully and fairly presenting his case. Id. Likewise, in this case, although the preventive maintenance records should have been produced by Pilgrim's Pride during discovery, Miller cannot now claim that he was taken by surprise by the existence of these records or was otherwise prevented from fully presenting his case. See also, Korak v. Bursaw Oil Corp., 288 F.3d 15, 21-22 (1st Cir. 2002) (holding that "[w]hen a party

12

is capable of fully and fairly preparing and presenting his case notwithstanding the adverse party's arguable misconduct, the trial court is free to deny relief under Rule 60(b)(3)").

Any prejudice to Miller's case caused by Pilgrim's Pride's failure to provide the preventive maintenance records was minimal in light of Pilgrim's Pride's arguments at trial, Miller's own testimony, and the cumulative nature of this data. Furthermore, because Miller would have been aware of the nature of these records prior to trial, he was not prevented from fully and fairly presenting his claim. Therefore, the plaintiff's motion for a new trial may not be granted on the basis of the lack of disclosure of the preventive maintenance records obtained from the SAP system.[2]

## C. Adverse Inference Instruction Related to Brandy Barb

Brandy Barb ("Barb") was called as a witness during trial and asserted her Fifth Amendment rights with regard to several questions related to her background. Apparently, Barb had falsified certain details of her educational and employment background when she was hired by Pilgrim's Pride, and its predecessor, in the Human Resources department.[3] Barb had been in charge of Human Resources at the Broadway plant and was involved in the discussions surrounding Miller's performance and ultimate termination.

During Barb's testimony, the court informed the jury that Barb had indicated that several of her responses to questions at her deposition relating to her background, education, and

---

[2] Although the plaintiff had requested additional argument on this issue, the court finds that such argument would not have been necessary or helpful in reaching its determination based upon the circumstances of the case and the records produced.

[3] This fact had been brought to light during discovery in this case. After giving her original deposition, Barb submitted an errata sheet which indicated she had falsified certain background and educational information. Barb also asserted her Fifth Amendment rights at that time. Barb was later terminated by Pilgrim's Pride.

13

criminal record had been false and that she had invoked her right against self-incrimination. The court then instructed that it had permitted Barb to invoke her Fifth Amendment rights with regard to those questions at trial as well and that the jury could consider those circumstances in assessing Barb's credibility as a witness. Before the jury was sent out to deliberate at the close of the evidence, the court also gave a final instruction to the jury as follows:

> You will recall that one witness in this case invoked her Fifth Amendment right not to testify in order to avoid self-incrimination. You will recall that the witness' concern was based on former testimony given during a discovery deposition. Sometime after, the witness provided information that she had answered falsely under oath to questions concerning her educational background, her prior work experience, and her criminal record. You may consider all of these circumstances in determining what weight, if any, to give to this witness' testimony.

Miller had proposed a much different jury instruction which the court rejected. That instruction would have specifically permitted the jury to draw an adverse inference against Pilgrim's Pride based upon Barb's testimony. Miller now states that, given Barb's position with Pilgrim's Pride, the separation agreement entered into between Barb and Pilgrim's Pride, and the fraud committed by Barb and exposed by Miller, the court should have given his more specific adverse inference instruction during the trial.

In determining whether a non-party witness's invocation of the Fifth Amendment privilege in the course of civil litigation warrants an adverse inference instruction, a court may consider: (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. LiButti v. United States, 107 F.3d 110, 123-24 (2nd Cir. 1997). In any case, "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and

will advance the search for the truth." 107 F.3d at 124.

In this case, Miller asserts that Barb's employment relationship with Pilgrim's Pride involved a high level management job in which she was in charge of Human Resources at the Broadway plant. Miller also contends that Pilgrim's Pride exerted control over Barb in that capacity and maintained control over Barb after she left the company through the separation agreement signed by the parties. In that agreement, Pilgrim's Pride agreed to forgo any claim to reimbursement from Barb for certain bonuses and relocation expenses paid by Pilgrim's Pride, and Barb agreed to refrain from making any statements which would be damaging to Pilgrim's Pride.

The court finds, however, that the LiButti factors did not dictate an adverse inference instruction in this case. Although Barb had been employed by Pilgrim's Pride in an upper level management position at the Broadway plant, Barb was no longer employed by Pilgrim's Pride at the time of her testimony at trial. Furthermore, the court finds that the evidence does not support a conclusion that Pilgrim's Pride was aware of Barb's deception prior to the revelations connected with Barb's deposition testimony or that Pilgrim's Pride continued to exercise any direct control over Barb after she was terminated. The court acknowledges the existence of the separation agreement signed by Barb and Pilgrim's Pride, however that agreement did not affect Barb's obligation to testify truthfully in court on the instant matter. In fact, the jury heard evidence at trial regarding the details of this separation agreement between the parties. Barb retained her own counsel with regard to the Fifth Amendment issues and decided to assert her right against self-incrimination relating only to her testimony regarding her background, not with regard to her actions as they related to Miller and his termination. The court also notes that there

15

was evidence indicating that Ted Lankford, not Barb, was the decision maker with regard to Miller's termination.

Based upon the foregoing, the court finds that there was insufficient support for an adverse inference instruction with regard to Barb. The court did have concerns with regard to Barb's lack of candor during her deposition testimony and her subsequent assertion of her Fifth Amendment rights. However, those concerns were addressed by instructing the jury to consider these issues in assessing the credibility of Barb's testimony. Therefore, the plaintiff's motion for a new trial may not be granted based upon the lack of an adverse inference instruction in this case.

**D.      Exclusion of Mischelle Fisher's Testimony**

Miller next claims that he should be granted a new trial on the basis of the court's exclusion of the testimony of Mischelle Fisher with regard to Barb's alleged discriminatory animus. Fisher had apparently worked at the ConAgra plant in Moorefield, West Virginia with Barb prior to its acquisition by Pilgrim's Pride. In 2003, Fisher claims that she spoke to Barb, the human resources manager for that plant at the time, who allegedly stated that she had been brought to the plant for the purpose of terminating employees who were on FMLA leave or who had medical restrictions and that she had, in fact, "weeded out a lot of injured or sick employees." See Pilgrim's Pride Corporation's Memorandum of Law in Opposition to Plaintiff's Motion for New Trial, Exhibit D ¶¶ 7 & 8.

Miller claims that he should have been permitted to introduce this testimony because, when Pilgrim's Pride purchased ConAgra and promoted Barb to human resources manager at Broadway, it effectively adopted her motives, which moved to Pilgrim's Pride with her. Miller

16

also contends that Bob Bahr hired Barb specifically to obtain her discriminatory animus. Miller further asserts that Barb was directly involved in the decision to terminate Miller and that her motives were relevant to demonstrate her state of mind and to prove that he was terminated because of his disability and the exercise of his FMLA rights.

In certain cases, evidence regarding the discriminatory attitudes of employees of a defendant may be admissible to demonstrate discriminatory animus of that employer. See, e.g., Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 655 (11th Cir. 1993) (holding that "[d]erogatory remarks indicative of a discriminatory attitude are generally admissible to prove discriminatory treatment) (internal citations omitted). Nevertheless, such evidence is generally only permissible when those employees are the actual decision makers for an employer or are primarily responsible for a particular employment decision. Hill v. Lockheed Martin Logistics Mgmt, Inc., 354 F.3d 277 (4th Cir. 2004) (holding that only the discriminatory motivations of those subordinates who are principally responsible for the employment decision or are the actual decision makers for the employer may be imputed to the employer in a discrimination case); Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 856 (10th Cir. 2000) (holding that anecdotal evidence of discrimination may be admitted only when the plaintiff can link that evidence to the disputed employment actions at hand or to the individuals involved in taking those actions).

In this case, the court finds that the evidence presented at trial appeared to demonstrate that Ted Lankford, not Barb, was the actual individual who ultimately made the decision to terminate Miller. Barb was necessarily involved in the process as the head of Human Resources at the plant, however that alone does not make her the actual decision maker or even principally responsible for the decision to terminate Miller. More importantly, however, the statements

17

allegedly made by Barb to Ms. Fisher were made while Barb was employed by ConAgra, not

Pilgrim's Pride, at a separate facility in another state. The court finds that it would have been

inappropriate to allow Ms. Fisher's testimony and to permit such statements to be imputed to

Pilgrim's Pride in the face of an absence of evidence of any plan on the part of Pilgrim's Pride to

terminate employees with disabilities or employees who took FMLA leave or to hire Barb for

that purpose. Therefore, as the court noted prior to the trial of this matter, the potential for

prejudice to the defendant outweighed any probative value from Ms. Fisher's testimony, and the

plaintiff's motion for a new trial may not be granted on the basis of the court's exclusion of this

testimony.

**E.    Admission of Dr. Conell's February 15, 2006 Letter**

Over Miller's objection, the court admitted into evidence a letter dated February 15, 2006

written by Dr. Lawrence Conell, Miller's treating psychiatrist, to Don Stonesifer, a rehabilitation

counselor, in an effort to assist Miller in obtaining rehabilitation services. The language which

troubles Miller states as follows:

> He has had an extremely difficult time with employment over the last 9 years or so with
> multiple losses of job and conflicts in the workplace, which he feels are rarely if ever his
> fault. However, he is beginning to consider the possibility that his underlying psychiatric
> condition could be contributing to his difficulties. I am highly suspicious that in fact they
> are but that this has been out of his awareness.

See Pilgrim's Pride Corporation's Memorandum of Law in Opposition to Plaintiff's Motion for

New Trial, Exhibit G.

Miller states that this letter should not have been admitted into evidence because Dr.

Conell's statements were purely speculative and were made approximately one and a half years

after the time period at issue in his suit. Miller also contends that the admission of this letter

violated this court's order of May 30, 2007 in which the court stated the following:

> 3. As to defendant's motion in limine to prohibit introduction of expert testimony of the plaintiff's health care providers, the motion is granted in part and denied in part. Specifically, such witnesses shall be allowed to answer questions regarding their treatment of plaintiff, their diagnoses and prognoses. However, no such witnesses will be allowed to offer opinion testimony as to whether the plaintiff possessed the capacity to perform his job as Maintenance Supervisor.

> . . .

> 6. Plaintiff's motion in limine to exclude testimony and evidence concerning his work performance for a subsequent employer is conditionally denied. However, if plaintiff opts to narrow the focus of the trial as outlined by the court at the hearing, and as provided in paragraph 1 above, defendant shall not be allowed to adduce such evidence.

Miller asserts that the letter stated Dr. Conell's suspicions, rather than describing his treatment of Miller or a diagnosis or prognosis as permitted by the court's order, that it spoke to his capacity to perform the job of maintenance supervisor in violation of the court's order, and that it addressed subsequent work performance as prohibited by the court's order. Therefore, Miller concludes that the minimal probative value of the letter did not outweigh the letter's potential to confuse, unfairly prejudice or mislead the jury.

As Pilgrim's Pride points out, however, Miller himself called Dr. Conell as a witness at trial and introduced both his opinion, and that of Dr. Goolsby, with regard to Miller's current medical condition. In addition, the statements included in Dr. Conell's letter were confirmed by the July 10, 2006 Mental Status Evaluation Form completed by Dr. Conell and admitted into evidence during the trial without objection from Miller. In that evaluation, Dr. Conell stated that issues with co-workers and bosses had led to loss of jobs and that Miller had lost several positions due to "a combination of physical, psychiatric and possibly personality issues."

The court again finds that Dr. Conell's letter was, in fact, highly probative of Miller's

19

status as a qualified individual under the ADA. The letter did not reflect specifically upon Miller's capacity to perform the work as a maintenance manager, consistent with the court's earlier ruling. Instead, Dr. Conell discussed Miller's characteristics and attributes, particularly with regard to his emotional status, as they affected his work during a particular period of time. Furthermore, the opinion stated in the letter was consistent with that included in the July 10, 2006 Mental Status Evaluation Form and, therefore, not highly prejudicial to the plaintiff as the evidence was merely cumulative. Again, the court notes that Miller himself called Dr. Conell as a witness and opened the door for the introduction of related evidence such as the February 15, 2006 letter. Therefore, the court concludes that neither the admission of Dr. Conell's letter, nor any of the grounds previously addressed, justifies the granting of Miller's motion for a new trial. As such, the plaintiff's motion will be denied.[4]

## III.    DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Pilgrim's Pride has brought its renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 with regard to Miller's claim of discriminatory discharge in violation of the ADA, relying primarily upon arguments advanced in its initial motion for judgment as a matter of law. In considering a renewed motion under Rule 50, a court must determine whether substantial evidence supports the jury's verdict. Bonner v. Dawson, 404 F.3d 290, 295 (4th Cir. 2005). If the court determines that "the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party," considering the evidence in favor of the nonmoving party and "drawing every legitimate inference in that party's favor," it

---

[4] Because Miller's motion for a new trial will be denied, the court finds it unnecessary to address the parties' arguments regarding the propriety of a partial new trial with regard only to the same decision determination in this case.

must grant the motion. Figg v. Shroeder, 312 F.3d 625, 635 (4ᵗʰ Cir. 2002) (internal citations omitted). In other words, judgment as a matter of law in favor of the moving party is appropriate only "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." Singer v. Dungan, 45 F.3d 823, 827 (4ᵗʰ Cir. 1995) (quoting Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1333 (11ᵗʰ Cir. 1994)).

Pilgrim's Pride first contends that the evidence was insufficient to support the court's ruling that Miller was disabled as a matter of law. A disability under the ADA is (1) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). In an opinion dated July 6, 2007, this court found that Miller's physical and mental impairments substantially limited a major life activity, relying, in part, on the opinion of the defendant's expert, Dr. Robert S. Brown. Dr. Brown had noted that Miller was limited in the major life activity of walking because of his heart problems and that his impairments acted together to produce severe functional limitations in his ability to concentrate and avoid distraction. Dr. Brown had also testified that Miller's impairments met the requirements of a disability under the ADA.

Pilgrim's Pride now asserts that Dr. Brown could not speak to whether Miller's impairments met the legal requirements for a disability under the law because that is a matter for the court alone to decide. The court agrees that Dr. Brown's opinion with regard to whether Miller was legally disabled under the ADA was not relevant. However, the court made its own determination based upon the evidence presented by the parties and without regard to Dr. Brown's legal conclusion. Although Pilgrim's Pride now contends that Miller experienced only

21

intermittent symptoms from his medical conditions, the evidence does not support this assertion. As previously stated, Dr. Brown, the defendant's own expert, testified that Miller's impairments, including his heart condition, caused him to be limited in the major life activity of walking and operated in tandem to cause limitations in his mental abilities, including his ability to concentrate and avoid distraction.

Furthermore, there was evidence presented at the trial which supported Miller's contention that Pilgrim's Pride perceived him as disabled. Pilgrim's Pride was aware that Miller had experienced coronary and mental issues during his tenure as maintenance manager, and Ted Lankford apparently believed that the stress of Miller's job was causing some of his heart problems. Therefore, the court finds that its previous determination that Miller is disabled as a matter of law is supported by the evidence in the record.

Pilgrim's Pride next claims that the evidence adduced at trial failed to demonstrate that Miller was qualified for the maintenance manager position. Under the ADA, it is unlawful to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Pilgrim's Pride contends that the position inherently involved stress and high time demands and that Miller's physicians stated that he was unable to effectively deal with stress. As the plaintiff notes, however, none of Miller's physicians recommended that he stop working altogether. In fact, testimony from several individuals at trial indicated that Miller was

performing satisfactorily at the time Lankford arrived at the Broadway plant. In addition, Miller had received good performance ratings in the past and was apparently respected by his subordinates. Although other evidence did demonstrate Pilgrim's Pride's dissatisfaction with Miller's overall job performance, the court nevertheless finds that the evidence presented at trial also supported Miller's claim that he was, in fact, qualified to perform the position of maintenance manager.

Finally, Pilgrim's Pride contends that "the evidence did not demonstrate that Pilgrim's Pride intentionally discriminated against Mr. Miller because of a disability or that there was any causal connection between Mr. Miller's purported disability and his termination." Instead, Pilgrim's Pride asserts that the evidence showed that Miller was unable to perform his job to Pilgrim's Pride's expectations. While the jury ultimately found that Pilgrim's Pride would have terminated Miller regardless of his disability, the court finds that the evidence adduced at trial was sufficient to support the jury's finding that Pilgrim's Pride terminated Miller because of his disability in violation of the ADA. For example, Pilgrim's Pride apparently suggested a lower paying, lower stress job to Miller, expressed concern about his absence from the workplace while he was on medical leave, and terminated him within five days of his trip to the hospital for chest pains and anxiety. Therefore, because there was substantial evidence to support the jury's verdict in this case, the defendant's renewed motion for judgment as a matter of law will be denied.

## IV.   CONCLUSION

For the reasons set forth above, the plaintiff's motion for a new trial on the same decision finding with regard to his claims under the ADA and the FMLA as well as the defendant's renewed motion for judgment as a matter of law with regard to the plaintiff's claim for

23

discriminatory discharge under the ADA will be denied.

The Clerk of Court is hereby directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER:     This _16th_ day of January, 2008.

_Josh Conrad_
United States District Judge